UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

DANIELLE I. GHANI,                        )
                                          )
        Plaintiff,                        )
                                          )
    v.                                    )        Case No. 1:24-cv-568-GWC
                                          )
TOWN OF WEST SENECA,                      )
ANTHONY R. ANDOLINA, TYLER                )
BEBAK, and JOHN DOE OFFICERS,             )
                                          )
        Defendants.                       )

**ORDER AND OPINION ON MOTION TO DISMISS**
**(Doc. 10)**

Plaintiff Danielle Ghani brings this action under 42 U.S.C. § 1983 against the Town of

West Seneca, Officer Anthony Andolina, Officer Tyler Bebak, and John Doe Officers for

violation of her Fourth and Fourteenth Amendment rights in connection with an incident on

June 15, 2021, when officers responded to Ms. Ghani's 911 call seeking assistance managing her

son's behavior, and in connection with subsequent child endangerment charges that were brought

against her.  She asserts claims for unreasonable search and seizure, use of excessive force, false

arrest, malicious prosecution, destruction of evidence, and fabrication of evidence based on the

actions of the named law enforcement officers.  She also seeks to hold the Town of West Seneca

liable for the actions of these officers.  (*See* Doc. 8.)

Ms. Ghani filed this action on June 14, 2024.  (*See* Doc. 1.)  Defendants filed a Motion to

Dismiss the Complaint.  (Doc. 6.)  The court invited Ms. Ghani to respond by filing an Amended

Complaint, which she did.  (Doc. 8.)  Defendants filed a new Motion to Dismiss, which is

currently pending before the court.  (Doc. 10.)  The parties have completed their briefing on the

motion, and the court heard oral argument on July 28, 2025.

**Factual Background**

The court draws the following facts from the Amended Complaint.  As required on a motion to dismiss, the court accepts these facts as true for the purposes of this opinion.  *Trs. of Upstate N.Y. Eng'rs. Pension Fund v. Ivy Asset Mgmt.*, 843 F.3d 561, 566 (2d Cir. 2016).

Ms. Ghani is the mother of three children.  (Doc. 8 ¶ 9.)  She describes her history with the West Seneca Police Department ("WSPD") and Erie County Child Protective Services ("CPS") as "tumultuous," and motivated in part by "allegations regarding her religious beliefs." (*Id.* ¶ 7.)  Her contact with CPS began in 2017, when the agency initiated an investigation based on concerns about her daughter's frequent absence from school.  (*Id.* ¶ 10.)  Although Ms. Ghani complied with CPS's investigation and requirements, the agency filed a neglect petition against her in February 2017, which Ms. Ghani describes as "false."  (*Id.* ¶ 12.)  As a result of the petition, Ms. Ghani lost custody of her children for three years, during which time they lived with their father, Ms. Ghani's ex-husband.  (*Id.* ¶¶ 12–13.)  Ms. Ghani notes that she had a five-year order of protection in place against her ex-husband at that time, imposed by the Integrated Domestic Violence Court.  (*Id.* ¶¶ 8, 11.)  Ms. Ghani believes her children were "subjected to an unhealthy and potentially abusive environment while in their father's care."  (*Id.* ¶ 14.)

After Ms. Ghani lost custody of her children, the West Seneca Police Department brought four child endangerment charges against her.  (*Id.* ¶ 15.)  She alleges that WSPD "conspired with CPS" in the filing of those charges and that WSPD and CPS took these actions "to prevent the lawful return of [Ms. Ghani's] children, despite there being a safety plan and a safe home for the children to reside in at the time."  (*Id.*)  She describes the charges as "falsely brought."  (*Id.*)  In January 2021, the charges were dismissed, and Ms. Ghani regained custody of her children.  (*Id.* ¶ 16.)

Since regaining custody of her children, Ms. Ghani has struggled to manage their behavioral issues, which she believes stem from the children's experiences under their father's care. (*Id.* ¶ 17.) She has had particular trouble with her son Ashton, "who has a history of violent outbursts and resisting parental authority." (*Id.*) Between January 2021 and June 2021, "Ms. Ghani had multiple interactions with the West Seneca Police Department regarding Ashton's behavior." (*Id.* ¶ 18.) "WSPD did not always document these incidents accurately, often construing the truth to make the children look innocent and Ms. Ghani appear unstable." (*Id.*)

On or about June 11 or June 12, 2021, Ms. Ghani received a letter from CPS expressing concern about her children's tardiness at school. (*Id.* ¶ 19.) Ms. Ghani responded by imposing a strict 11:00 p.m. bedtime for her sons, Aidan and Ashton. (*Id.*)

On June 12, 2021, WSPD Officer Anthony Andolina responded to a call at Ms. Ghani's home. (*Id.* ¶ 20.) Ms. Ghani wanted to remove Ashton from her home, but the responding officers would not assist her in doing so. (*Id.* ¶ 22.) While Officer Andolina was at Ms. Ghani's home, he "suggested to . . . Ashton . . . that Ms. Ghani might be mentally ill and in need of hospitalization, despite reports indicating that she was calm and cooperative during the interaction." (*Id.* ¶ 20.)

On June 15, 2021, between 11:00 p.m. and 11:45 p.m., Ashton was "exhibiting disruptive and aggressive behavior" and refused to comply with Ms. Ghani's request that he go to bed. (*Id.* ¶ 21.) When Ms. Ghani instructed him to turn off his electronic devices and go to sleep, he refused, continuing to argue with Ms. Ghani. (*Id.*) Ms. Ghani called WSPD for help managing Ashton's behavior. On the call, she requested help removing Ashton from her home. (*Id.* ¶ 22.)

3

The dispatcher instructed WSPD to send a car to Ms. Ghani's home and stated that "the usual suspect is going bonkers on her son." (*Id.* ¶ 23.)

Officer Andolina, Officer Bebak, and other John Doe WSPD officers responded to the 911 call. Upon arrival, the officers entered Ms. Ghani's home and, without speaking to Ms. Ghani, proceeded to Ashton's room. (*Id.* ¶ 25.) Ms. Ghani stayed in the kitchen, where she heard Officer Andolina asking Ashton if he wanted to leave and where he wanted to go. (*Id.* ¶ 26.) Ashton agreed to go to his sister's house. (*Id.*) At that point, Ms. Ghani approached Ashton's room to tell the officers that Ashton could not go to his sister's house and to explain why she wanted Ashton to go to his father's house instead. (*Id.* ¶ 27.) She was holding a cell phone in each hand. (*Id.* ¶ 38.) As she began to state why she wanted Ashton to go to his father's house, Officer Bebak grabbed Ms. Ghani's forearm without warning. (*Id.* ¶ 28.) Ms. Ghani pulled her arm away and said, "No." (*Id.* ¶ 29.)

Officer Andolina then yelled at Ms. Ghani, "Get out of the room." (*Id.*) She refused, "stating that this was her home and that the West Seneca Police Department and its officers had messed up her life." (*Id.* ¶ 30.) Officers Andolina and Bebak responded by grabbing Ms. Ghani, pulling her into the room, and pinning her against the wall, each officer holding one of her upper arms tightly. (*Id.* ¶ 31.) Ms. Ghani told officer Andolina to arrest her if that was his intention. (*Id.* ¶ 32.) The officers then "took Ms. Ghani to the ground" and forced her hands behind her back. (*Id.* ¶ 33.) Ms. Ghani resisted. (*Id.*) One of the officers knelt on Ms. Ghani's back, causing her to scream. (*Id.*) She asked her children to video record the incident as evidence. (*Id.*)

The officers handcuffed Ms. Ghani and brought her to the kitchen, where additional officers had arrived on scene. (*Id.* ¶ 35.) Officer Bebak claimed that they had arrested Ms.

Ghani because she spat at Officer Andolina. (*Id.*) At that point, Ms. Ghani told the officers that she had recorded the entire incident on her phones. (*Id.* ¶ 36.) When she later retrieved her phones, the recordings were gone. (*Id.*) Ashton told Ms. Ghani he had seen the officers handling Ms. Ghani's phones after she was taken to the police station. (*Id.*)

The police arrested Ms. Ghani for obstructing governmental administration in the second degree in violation of New York Penal Law § 195.05, resisting arrest in violation of New York Penal Law § 205.30, and harassment in the second degree in violation of New York Penal Law § 240.26. (*Id.* ¶ 37.) In the affidavits supporting the charges, the officers stated that Ms. Ghani had entered the room yelling profanities at Officer Andolina and that he had repeatedly told her to step back. (*Id.* ¶ 38.)

On or about September 7, 2021, WSPD brought new criminal charges against Ms. Ghani for child endangerment unrelated to the events of June 15, 2021. (*Id.* ¶ 43.) The charges involved an incident with Ms. Ghani's daughter. The West Seneca Town Court dismissed the charges in October 2021 after Ms. Ghani's daughter told the District Attorney that Ms. Ghani had done nothing wrong. (*Id.* ¶ 44.) WSPD also brought charges against Ms. Ghani for harassment on October 13, 2021, on the basis of a phone call that Ms. Ghani made to the mother of her sons' friend. (*Id.* ¶ 45.) Ms. Ghani appears to have made the call because she wanted the friend's mother to send her sons home, which the other mother refused to do. (*Id.*)

Ms. Ghani sustained significant injuries to her shoulders, back, and neck from the events on June 15, 2021. Her treating doctors believe that the force used by Officer Andolina caused a shift in her cervical spine, resulting in pain that radiates into her arm. (*Id.* ¶ 34.) She sought medical treatment immediately upon her release from police custody and continues to seek medical care for her injuries to this day. (*Id.* ¶¶ 41–43, 46.) Ms. Ghani's treating physicians

have informed her that her shoulder injury may be permanent and may eventually require surgery. (*Id.* ¶ 47.) She was diagnosed with a rotator cuff injury and continues to experience pain in her shoulders that radiates down her arms. (*Id.*) She has undergone physical therapy for her condition, has been prescribed medication, and receives regular cortisone shots to manage her pain. (*Id.*) Ms. Ghani also reports experiencing sadness, depression, anxiety, flashbacks, trouble sleeping, and emotional distress on a daily basis since June 15, 2021. (*Id.* ¶ 48.)

### Rule 12(b)(6) Standard

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff "must plead enough facts to state a claim to relief that is plausible on its face." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 78 (2d Cir. 2017) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)) (internal quotation marks omitted). In evaluating a Rule 12(b)(6) motion, the court must "accept[] all factual allegations as true and draw[] all reasonable inferences in favor of the plaintiff." *Id.* (quoting *Trs. of Upstate N.Y. Eng'rs.*, 843 F.3d at 566) (internal quotation marks omitted). "Dismissal is appropriate when 'it is clear from the face of the complaint . . . that the plaintiff's claims are barred as a matter of law.'" *Biocad JSC v. F. Hoffmann-La Roche*, 942 F.3d 88, 93 (2d Cir. 2019) (alteration in original) (quoting *Parkcentral Glob. Hub Ltd. v. Porsche Auto Holdings SE*, 763 F.3d 198, 208–09 (2d Cir. 2014)).

### Qualified Immunity Standard

Defendants raise the defense of qualified immunity several times in the Motion to Dismiss. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "A right is clearly established when it

is sufficiently clear that every reasonable official would have understood that what he is doing

violates that right." *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 5 (2021) (internal citation and

quotation marks omitted). "[T]he law does not require a case directly on point for a right to be

clearly established, [but] existing precedent must have placed the statutory or constitutional

question beyond debate." *Id.* (internal citation and quotation marks omitted). "Because

qualified immunity is an affirmative defense, '[i]t is for the official to claim that his conduct was

justified by an objectively reasonable belief that it was lawful." *Linton v. Zorn*, 135 F.4th 19,

30–31 (2d Cir. 2025) (quoting *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)) (alteration in

original).

The Second Circuit has held that "usually, the defense of qualified immunity cannot

support the grant of a Rule 12(b)(6) motion for failure to state a claim upon which relief can be

granted," *McKenna v. Wright*, 386 F.3d 432, 435 (2d Cir. 2004) (cleaned up) (emphasis omitted),

but "in appropriate circumstances a district court may address qualified immunity at the

pleadings stage," *Matzell v. Annucci*, 64 F.4th 425, 434 (2d Cir. 2023) (internal quotation marks

and citation omitted). "[A] qualified immunity defense faces a formidable hurdle at the motion

to dismiss stage and is usually not successful." *Id.* (cleaned up). "Where a defendant presents a

qualified immunity defense on a motion to dismiss . . . the plaintiff is entitled to all reasonable

inferences from the facts alleged, not only those that support his claim, but also those that defeat

the immunity defense." *Id.* (internal quotation marks and citation omitted). "[A]s with all

Rule 12(b)(6) motions, the motion may be granted only where 'it appears beyond doubt that the

plaintiff can prove no set of facts in support of his claim that would entitle him to relief.'"

*McKenna*, 386 F.3d at 436 (quoting *Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1494 (2d Cir.

1992)).

## Analysis

Ms. Ghani brings six causes of action against the defendant officers: unreasonable search and seizure, use of excessive force, false arrest, malicious prosecution, destruction of evidence, and fabrication of evidence. She also seeks to hold the Town of West Seneca liable for the actions of the defendant officers. The court addresses these issues in turn.

## I.    Unreasonable Search and Seizure

Ms. Ghani asserts that "[t]he actions of Defendant Officers in entering Ms. Ghani's residence without a warrant, probable cause, or exigent circumstances, and remaining in her residence after she revoked consent, violated her rights under the Fourth Amendment to the United States Constitution to be free from unreasonable searches and seizures." (Doc. 8 ¶ 58.) Defendants counter that exigent circumstances justified the warrantless entry (Doc. 10-1 at 8–10) or, in the alternative, that qualified immunity shields them from liability (*Id.* at 10–13).

### A.    Exigent Circumstances

The Amended Complaint alleges that, when Officers Andolina and Bebak arrived, they "entered Ms. Ghani's home" and went directly upstairs to Ashton's room without speaking to Ms. Ghani. (Doc. 8 ¶ 25.) Thus, reading the Amended Complaint in the light most favorable to Ms. Ghani, she did not give consent for them to enter her home. Defendants concede that the officers did not have a warrant. (Doc. 10-1 at 8.)

"It is a basic principle of Fourth Amendment law that searches and seizures inside a home without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980). However, Defendants contend that the nature of Ms. Ghani's 911 call gave rise to exigent circumstances justifying the warrantless entry. "One well-recognized exception [to the warrant requirement] applies when the exigencies of the situation make the needs of law

enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment." *Kentucky v. King*, 563 U.S. 452, 460 (2011) (cleaned up). The quintessential exigent circumstance is to render aid "to a person whom [the police] reasonably believe to be in distress and in need of that assistance." *Tierney v. Davidson*, 133 F.3d 189, 196 (2d Cir. 1998).

Defendants rely on *Tierney v. Davidson* for the proposition that "[c]ourts have recognized the combustible nature of domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger." 133 F.3d at 197. Defendants then argue that, because of Ashton's "history of violent outbursts" (Doc. 8 ¶ 17) and WSPD's past interactions with Ms. Ghani "regarding Ashton's behavior" (*Id.* ¶ 18), Ms. Ghani's 911 call gave them reason to believe that she was in imminent danger. (*See* Doc. 10-1 at 9.)

Nothing in the Amended Complaint supports the conclusion, as Defendants suggest, that Ashton's "violent outbursts were known . . . to . . . the Defendant Officers." (*Id.* at 10.) Although the Amended Complaint alleges that WSPD had "multiple" interactions with Ashton, the Amended Complaint only identifies one prior instance in which either Officer Andolina or Officer Bebak, specifically, responded to a call at Ms. Ghani's home. (*See* Doc. 8 ¶ 20.) And the Amended Complaint does not allege that Ashton engaged in any violent behavior during Officer Andolina's June 12 call that would have put him on notice about Ashton's violent behavior.[1] (*Id.*)

---

[1] The court also notes that the Amended Complaint does not provide any examples of Ashton's "violent" behavior. Violence can vary dramatically in severity, and it is not clear yet in this case the nature of Ashton's conduct either on June 12 or on prior occasions involving the police.

9

The Amended Complaint does not suggest that Ms. Ghani expressed any fear of her son when she called the police on June 15. (*Id.* ¶¶ 22–23.)  In fact, the Amended Complaint specifically alleges that, on the call, "Ms. Ghani did not state that she was afraid of her son" and that she requested assistance dealing with his "defiant" behavior. (*Id.* ¶ 23.)  Read in the light most favorable to Ms. Ghani, the Amended Complaint suggests nothing more than that the officers were responding to a call regarding a teenage boy's defiant refusal to go to bed and to assist his mother in removing him from the home.[2]

Not all domestic disputes are exigent circumstances permitting warrantless entry. *See Grant v. City of Syracuse*, No. 15-cv-445, 2017 WL 5564605, at *12 (N.D.N.Y. Nov. 17, 2017) (stating that "an alleged domestic dispute does not provide an open invitation" for officers to enter a home (citing *Penree by Penree v. City of Utica, New York*, 694 F. App'x 30, 32 (2d Cir. 2017))).  *Tierney*, the case on which Defendants rely, importantly qualifies that courts afford "great latitude" to an officer's decision to make a warrantless entry only when "the officer had *substantial reason* to believe that one of the parties to the dispute was in danger."  133 F.3d at 197 (emphasis added).  That is, the officers must have "probable cause to believe that a person is 'seriously injured or threatened with such injury.'"  *Chamberlain v. City of White Plains*, 960 F.3d 100, 105 (2d Cir. 2020) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)).  "The mere 'possibility of danger' is insufficient."  *Id.* (quoting *Hurlman v. Rice*, 927 F.2d 74, 81 (2d Cir. 1991)).  And the Supreme Court has stated that "the police bear a heavy burden when attempting to demonstrate an urgent need."  *Welsh v. Wis.*, 466 U.S. 740, 749–50 (1984).

---

[2] Even if the officers knew of Ashton's violent tendencies, the Second Circuit has emphasized that general knowledge that an individual has put household members at risk in the past does not amount to sufficient evidence that there is an "imminent" threat "of emergency proportions" on the day in question. *Hurlman*, 927 F.2d at 77, 81.

In that regard, the facts in *Tierney* and the cases it cites differ in very important respects from the facts alleged in this case. In *Tierney*, the officer "was responding to what he was told was a 'bad' domestic disturbance, the worst yet at this location according to experienced observers." *Id.* at 197. "[W]hen he arrived at the scene, he was informed by neighbors that the shouting had ended right before his arrival; and as he approached the house, Davidson heard nothing and found a broken window pane." *Id.* In *State v. Applegate*, 68 Ohio St.3d 348, 626 N.E.2d 942 (1994), as cited in *Tierney*, the arriving officers were responding to a "'priority' domestic violence call" and, upon arrival, "heard noises indicating that violent activity was occurring inside." *Tierney*, 133 F.3d at 197 (quoting *Applegate*, 626 N.E.2d at 944). Similarly, in *Magnuson v. Cassarella*, 813 F. Supp. 1321 (N.D. Ill. 1992), also cited by *Tierney*, a neighbor called the police regarding a domestic disturbance because she could hear screaming and knew there was an infant in the house. When the police arrived, they heard continued screaming. *Id.* at 1322.

In each of those cases, it was reasonable for the police to conclude that one or both parties to a domestic dispute were in immediate danger—not simply because it was a domestic dispute, but because there were additional pieces of evidence pointing toward the existence of exigent circumstances. Here, the Amended Complaint does not state that anyone was screaming. No suspicious noises were emanating from the home. Ms. Ghani did not state on the phone that she was concerned about her safety. She indicated that she wanted assistance removing her son from her home. And, when the police arrived, they could see that Ms. Ghani was alone in the kitchen, on a different floor of the house than her son. Ms. Ghani's allegation that the dispatcher told the police that the "usual suspect is going bonkers on her son," further undercuts Defendants' argument that they believed Ms. Ghani was in danger. (Doc. 8 ¶ 23.)

11

Ms. Ghani further asserts that, even if Defendants' initial entry was justified by either exigent circumstances or implicit consent, neither consent nor exigent circumstances permitted the officers' continued presence in her home or their order for her to leave Ashton's bedroom.[3] (Doc. 11 at 9.)  "If police officers have neither a warrant nor valid consent, they need no less than both probable cause and exigent circumstances in order to lawfully enter *or remain* in a person's home." *Conroy v. Caron*, 275 F. Supp. 3d 328, 341 (D. Conn. 2017); *see also, Chamberlain*, 960 F.3d at 107 ("A warrantless search is no longer permissible once the exigency ends") (quoting, in parenthetical, *United States v. O'Neill*, 239 F. Supp. 3d 651, 658 (W.D.N.Y. 2017)).  Likewise, "[a] seizure of private property without a warrant, consent[,] exigent circumstances or probable cause . . . is 'presumptively unreasonable.'"  *Newsome v. Bogan*, 617 F. Supp. 3d 133, 147 (W.D.N.Y. 2022) (quoting *United States v. Place*, 462 U.S. 696, 701 (1983)).  Here, the order for Ms. Ghani to leave the bedroom "was an interference with [her] possessory right [of her home] by a government actor, and, thus, a seizure."  *O'Neill*, 239 F. Supp. 3d at 659.

Accepting the facts alleged in the Amended Complaint as true, no exigent circumstances existed to justify the officers' continued presence in Ms. Ghani's home, nor the order to leave Ashton's bedroom.  None of the allegations in the Amended Complaint suggest that either Ashton or Ms. Ghani were exhibiting aggressive or violent behavior when Ms. Ghani approached her son's bedroom.  Rather, Officers Andolina and Bebak were merely having a conversation with Ashton, and he had agreed to leave the home.  For her part, Ms. Ghani sought to explain why her son should go stay with his father rather than his sister.  Nor does the fact that

---

[3] Ms. Ghani also argues that neither exigent circumstances nor implied consent justified the officers' use of force against her.  Because Ms. Ghani brings a separate claim for excessive use of force, the court will set that particular issue aside for the moment.

Ms. Ghani pulled her arm away when Officer Andolina grabbed it constitute an "exigent circumstance" that would justify the order for Ms. Ghani to leave her son's bedroom, as her actions were not reasonable grounds for believing that anyone was in danger. *See Rattray v. City of New York*, No. 17-cv-8560, 2022 U.S. Dist. LEXIS 166312, at *12–13 (S.D.N.Y. Sept. 14, 2022) (fact that plaintiff was uncooperative with police, refused to answer questions, would not open door, and later tried to close door on the officers did not give officers reason to believe that there was an urgent need to render aid).

### B.    Qualified Immunity

Defendants argue in the alternative that, even if exigent circumstances did not exist, "[t]he factual circumstances pleaded in the Amended Complaint do not establish . . . a situation where it was sufficiently clear, to any reasonable officer, that exigent circumstances did not exist which would have precluded their decision to conduct a warrantless search," thus entitling them to qualified immunity.  (Doc. 10-1 at 11.)  The court disagrees.

Because the "clearly established law" standard "requires that the legal principle clearly prohibit the officer[s'] conduct *in the particular circumstances* before him," the court begins by defining the precise circumstances facing Officers Andolina and Bebak. *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018).  According to the Amended Complaint, the officers were responding to Ms. Ghani's call regarding Ashton's "defiant" behavior and requesting help removing Ashton from the home.  Ms. Ghani did not state during the phone call that she was afraid of her son or in danger in any way.  Officer Andolina was aware that Ashton had behavioral issues and had visited the home two days before.  The officers were not, however, aware of Ashton's violent tendencies or any past episodes of violence.  Upon arrival at the home, there were no outward indications of an ongoing dispute inside the home.

13

Based on these facts, no reasonable officer would have believed that someone inside Ms. Ghani's home was in urgent need of aid. And myriad binding and authoritative cases confirm that, at the time of the June 15, 2021, incident, it was clearly established that a warrantless entry on these facts would amount to a violation of the Fourth Amendment.

As already noted, it is a fundamental principle of Fourth Amendment law that searches and seizures within a home without a warrant or consent are presumptively unreasonable. *Groh v. Ramirez*, 540 U.S. 551, 559 (2004). And the law regarding what constitutes an exigent circumstance is abundant. *See Loria v. Gorman*, 306 F.3d 1271, 1283 (2d Cir. 2002) (collecting cases). "Specifically, the case law is clear that exigent circumstances in the context of a home entry are 'rare[],' and exist only in those situations where there is 'clear factual evidence showing an urgent need to render assistance.'" *Rattray*, 2022 U.S. Dist. LEXIS 166312,[4] at *19 (quoting *Stanton v. Sims*, 571 U.S. 3, 8 (2013); then quoting *Rivera v. Leto*, No. 04-cv-7072, 2008 WL 5062103, at *5 (2008) (collecting cases)) (alteration in original); *see also Hurlman v. Rice*, 927 F.2d 74, 81 (2d Cir. 1991) (explaining that there needs to be evidence supporting the officers' knowledge that an emergency exists, and the "mere possibility" of danger is not sufficient).

Taking the Complaint as true and drawing all reasonable inferences in Ms. Ghani's favor, there was no indication that anyone in the home was in urgent need of aid. Because clearly established law requires the officers to have had evidence to that effect, no reasonable officer could have believed—on the facts alleged—that exigent circumstances existed to justify a

---

[4] Although *Rattray* was decided on September 14, 2022—after the June 15, 2021, incident at issue in this case—the underlying incident in that case occurred on November 5, 2016. Thus, that case was addressing what was "clearly established" law as of November 2016. Anything that was "clearly established" for the purposes of *Rattray* was therefore clearly established before June 15, 2021.

warrantless entry of the home.  The Motion to Dismiss is therefore DENIED with respect to

Count I of the Amended Complaint.

## II.    Excessive Force

"The Fourth Amendment prohibits the use of unreasonable and therefore excessive force

by a police officer in the course of effecting an arrest." *Tracy v. Freshwater*, 623 F.3d 90, 96

(2d Cir. 2010).  The test is one of "objective reasonableness" and "requires balancing the nature

and quality of the intrusion on the plaintiff's Fourth Amendment interests against the

countervailing governmental interests at stake."  *Id.*

> When "conducting that balancing" in the context of police conduct with respect to
> a plaintiff, we consider the following so-called *Graham* factors: "(1) the nature and
> severity of the crime leading to the arrest, (2) whether the suspect pose[d] an
> immediate threat to the safety of the officer or others, and (3) whether the suspect
> was actively resisting arrest or attempting to evade arrest by flight."  We are also
> to consider the so-called *Figueroa* factors: "[4] the need for the application of force,
> [5] the relationship between the need and the amount of force that was used, [6] the
> extent of the injury that was inflicted, and [7] whether force was applied in a good
> faith effort to maintain or restore discipline or maliciously and sadistically for the
> very purpose of causing harm."

*Linton*, 135 F.4th at 31 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989); then quoting

*Figueroa v. Mazza*, 825 F.3d 89, 105 (2d Cir. 2016)) (alterations in original).

The Second Circuit has emphasized that it is typically inappropriate to dispose of an

excessive force claim at the motion-to-dismiss stage:

> Because of its intensely factual nature, the question of whether the use of force was
> reasonable under the circumstances is generally best left for a jury to decide.  Even
> in the arrest context, the reasonableness of the force used is often a jury question.
> These principles apply with even greater force at the motion to dismiss stage, where
> a court must assume the truth of the plaintiff's allegations and avoid resolving
> factual disputes.

*Oakley v. Dolan*, 980 F.3d 279, 284 (2d Cir. 2020).

A.    **Merits**

This case involves four separate instances of force, albeit in quick succession.  First,

when Ms. Ghani approached her son's room and began explaining that she wanted him to go to

his father's house, Officer Bebak "grabbed Ms. Ghani's forearm or wrist without warning or

provocation." (Doc. 8 ¶ 28.) Then, when Officer Andolina yelled at Ms. Ghani to leave the

room and she refused, Officers Andolina and Bebak "grabbed Ms. Ghani, pulled her into the

room, and pinned her against Ashton's bedroom wall, each holding one of her upper arms

tightly." (*Id.* ¶ 31.)  Third, when Ms. Ghani was still pinned against the wall and told Officer

Andolina to arrest her if that was his intention, the officers "took Ms. Ghani to the ground,

forcing her hands behind her back." (*Id.* ¶ 33.)  Finally, when Ms. Ghani resisted this force, one

of the officers placed a knee on Ms. Ghani's back. (*Id.*)

Defendants contend that Ms. Ghani's "physical interference" with "the officer[s']

interaction with her son" justified their "minimal" use of force.  (Doc. 10-1 at 16–17.)  They note

that, on the basis of that alleged interference, they charged Ms. Ghani with violating N.Y. Penal

Law § 195.05, Obstructing Governmental Administration in the Second Degree, "a serious

misdemeanor punishable [by] up to one year in jail." (*Id.* at 17.)  They further cite "the highly

volatile situation of domestic disputes and the violent nature of [Ms. Ghani's] son" as

justification for using force to "restrain [Ms. Ghani] while simultaneously managing her violent

son." (*Id.*)

Beginning with the severity of the crime leading to the arrest, the court notes that the

officers may not have had probable cause to arrest Ms. Ghani for violating N.Y. Penal Law

§ 195.05, as discussed in further detail below. *Dancy v. McGinley*, 843 F.3d 93, 111 (2d Cir.

2016) (physical interference with the activities of law enforcement does not violate § 195.05

unless the officer's acts are "authorized by law"). At the same time, "the Second Circuit has made clear that even if an arrest is unlawful, 'there is no *per se* rule that any force employed for that arrest is also unlawful.'" *McKnight v. Vasile*, No. 11-cv-6328P, 2017 WL 1176051, at \*24 (W.D.N.Y. Mar. 30, 2017) (quoting *Zainc v. City of Waterbury*, 603 F. Supp. 2d 368, 384–85 (D. Conn. 2009) (citing *Jones v. Parmley*, 465 F.3d 46, 62 (2d Cir. 2004))). Assuming for the moment that Ms. Ghani's actions *did* violate N.Y. Penal Law § 195.05, the court still rejects the suggestion that Ms. Ghani had committed a serious crime. *Id.* at \*25 (violation of 195.05 is "generally not" a "serious" crime).

Turning to the second factor, this court has already determined that—at least based on the allegations and drawing reasonable inferences in Ms. Ghani's favor—she posed no risk to the officers or her son that would have justified the use of force against her.

Third, it is true that Ms. Ghani admits in the Amended Complaint that she "resisted" the officers when they were holding her on the ground. She also admittedly pulled her arm away when Officer Bebak originally grabbed it. Yet, "[w]here an arrestee is resisting arrest, the force used by the officer 'must be reasonably related to the *nature of the resistance* and the forced used, threatened, or reasonably perceived to be threatened against the officer.'" *McKnight*, 2017 WL 1176051, at \*23 (quoting *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000)) (emphasis added). And, drawing all reasonable inferences in Ms. Ghani's favor, the factfinder could conclude that she was reacting to the force used against her, not "resisting arrest" in any meaningful sense. She withdrew her arm but did not run after pulling her arm free. In fact, the officers fault her for staying in place. Later, when she was on the ground, she states that she resisted because she was "shocked by the sudden use of force." Even if she *was* "resisting arrest" when she was on the ground, she was decidedly *not* resisting when the officers had her

pinned against the wall, yet they proceeded to force her to the ground. Moreover, other than the order to leave her son's bedroom, the officers never gave her any orders or warned her that they would be placing her under arrest. Instead, the Complaint alleges that they immediately resorted to force without giving Ms. Ghani the chance to comply.[5]

Turning to the need for force, the Complaint alleges that, when Officer Bebak grabbed Ms. Ghani's arm, he did so "without warning or provocation" and without first giving Ms. Ghani any order. (Doc. 8 ¶ 28.) At that point, she was not a threat to anyone, she was not under arrest, and she had defied no orders. Similarly, the Complaint alleges that, when Ms. Ghani refused to leave her son's bedroom despite Officer Andolina's orders, the officers pinned her against the wall "[w]ithout further warning or attempt at de-escalation." (*Id.* ¶ 31.) Again, they had not told Ms. Ghani that she was under arrest. And, as discussed later in this opinion, there was, accepting as true the facts alleged in the Complaint, no lawful basis to arrest Ms. Ghani. Then, although Ms. Ghani was not resisting the officers' actions, they took her to the ground and forced her hands behind her back. (*Id.* ¶ 33.) It was only then that Ms. Ghani resisted the officers in any way. Thus, accepting the facts alleged in the Complaint as true, there was little to no need for force at least up until the point at which Ms. Ghani was resisting the officers while lying on the ground. Two male officers had control of Ms. Ghani while she lay face down on the floor. One of them placed his knee on Ms. Ghani's back with such force that it caused her lasting injuries.

The court also considers the severity of the injuries inflicted. Here, the force used by the officers "likely caused a shift in [Ms. Ghani's] cervical spine, resulting in radiating pain in her arm" (*id.* ¶ 34), she sustained a rotator cuff injury and "experiences chronic pain in her shoulders

---

[5] In reaching this conclusion, the court notes that Ms. Ghani's refusal to comply with the officers' order to leave Ashton's bedroom does not constitute "resisting arrest." The officers had not expressed any intention to arrest Ms. Ghani at that point.

that radiates down her arms" (*id.* ¶ 47), she has had to undergo physical therapy and receives regular cortisone shots (*id.*), and she may require surgery for her injuries (*id.*).  These injuries are rather serious, especially in light of the relatively minor nature of Ms. Ghani's alleged crime and the fact that she posed no threat to the officers or her son.

Finally, the court considers whether "force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Figueroa*, 825 F.3d at 105.  None of the facts alleged in the Amended Complaint suggest that the officers acted "for the very purpose of causing harm."  Although Officer Bebak grabbed Ms. Ghani's arm "without warning," there is no allegation that he sought to harm her.  And, though the officers may not have been justified in pinning Ms. Ghani to the wall, the Amended Complaint alleges that they did so in response to her refusal to comply with their orders to leave her son's room.  Similarly, when one of the officers placed a knee on Ms. Ghani's back, she was admittedly "resisting" in some fashion.  Thus, though it is possible the officers acted unconstitutionally, these circumstances do not suggest that the officers acted out of malice.

Considering these circumstances together, the court concludes that a reasonable juror could find that the officers' use of force was excessive.

### B.    Qualified Immunity

Although Defendants do not expressly argue that they are entitled to qualified immunity on this claim, they state in the Motion to Dismiss that "Plaintiff's Amended Complaint does not contain allegations indicating that the Defendant Officers' conduct was so clearly unreasonable that every reasonable officer would understand it to be a violation of the Fourth Amendment, thus warranting dismissal of the excessive force claim."  (Doc. 10-1 at 17.)  Defendants therefore seem to invoke a qualified immunity defense.

When the incident in question occurred, it was clearly established that an officer cannot use more than very minimal force against a suspect who is neither dangerous nor resisting arrest. *See Rogoz v. City of Hartford*, 796 F.3d 236, 247–48 (2d Cir. 2015) (denying qualified immunity where the defendant officer allegedly jumped on plaintiff's back knee-first while plaintiff was lying prone on the ground with his hands behind his back); *Maxwell v. City of New York*, 380 F.3d 106, 109 (2d Cir. 2004) (reversing grant of summary judgment where officer shoved plaintiff into back of a police car and the plaintiff's head "struck a hard surface of the car" causing "pain in[] her arm and lower back and . . . a post-concussive syndrome" for approximately one week); *Robison v. Via*, 821 F.2d 913, 924–25 (2d Cir. 1987) (denying summary judgment where officer pushed plaintiff against the door of her car, "yanked" her out, "threw her up against the fender," and "twisted her arm behind her back," even though plaintiff suffered only bruises (cleaned up)); *Calamia v. City of New York*, 879 F.2d 1025, 1035 (2d Cir. 1989) (denying immunity to an officer who shoved the plaintiff to the floor as soon as he answered the door and cuffed him); *Mickle v. Morin*, 297 F.3d 114, 121–22 (2d Cir. 2002) (holding that a rational juror could find use of force excessive when handcuffing caused bruising and dislocated rotator cuff and plaintiff's only offense was making non-emergency calls to 911). Indeed, "in some circumstances, no use of force is reasonable because none is required." *McKnight*, 2017 WL 1176051, at *23 (quoting *Weather v. City of Mount Vernon*, No. 08-cv-192, 2011 WL 1046165, at *9 (S.D.N.Y. 2011), *aff'd*, 474 F. App'x 821 (2d Cir. 2012)).

Where a plaintiff was neither dangerous nor resisting arrest, the Second Circuit has denied summary judgment where primary aspects of the force included shoving a plaintiff against a hard surface such as a car door and twisting their arm behind their back. *Robison*, 821 F.2d at 924. Courts in this circuit have also denied summary judgment on excessive force claims

centering around officers placing their knee on an individual's back in the course of handcuffing. *Dejesus v. City of Yonkers*, No. 22-cv-2817, 2025 WL 81386, (S.D.N.Y. Jan. 13, 2025) (collecting cases predating June 15, 2021).

Here, Defendants argue that "Plaintiff's physical interference, coupled with the highly volatile situation of domestic disputes and the violent nature of her son, justified the Defendant Officers' minimal use of force to restrain her while simultaneously managing her violent son." (Doc. 10-1.) This argument fails for at least two reasons. First, in *Rogoz*, the Second Circuit rejected the defendant officers' position that, although the plaintiff "was complying with officers' directions at the very moment in time that force was used against him," the force was justified because, as the district court put it, "the totality of the circumstances sp[oke] to a level of urgency that preclude[d] a finding in Rogoz's favor." 796 F.3d at 248 (quoting defendant's brief; then quoting *Rogoz v. City of Hartford*, No. 11-cv-500, 2013 WL 3816580, at *13 (D. Conn. July 22, 2013) (alterations in original)). The court explained that the argument was "contrary to the *Graham* [*v. Connor*, 490 U.S. 386 (1989)] principle that, in the assessment of '[t]he "reasonableness" of a particular use of force . . . from the perspective of a reasonable officer on the scene' in light of the particular circumstances, a 'standard of reasonableness *at the moment* applies.'" *Rogoz*, 796 F.3d at 248 (quoting *Graham*, 490 U.S. at 396) (alterations in original) (emphasis added). Second, as in *Rogoz*, the underlying facts, viewed in the light most favorable to Ms. Ghani, do not support the contention that the circumstances were so urgent that force was warranted. The Amended Complaint includes no facts suggesting that Ashton was behaving violently that evening or that this particular domestic dispute was "volatile."

Ms. Ghani allegedly sustained serious injuries from the force used in this case. The crime she was charged with is not a particularly serious one, and, as discussed below, it was not

reasonable for the officers to believe she had committed that crime. She posed a danger to no one. The officers never gave her the opportunity to comply with an order to submit to arrest, instead immediately resorting to force. And her attempted resistance to the officers, even if characterized as "resisting arrest," was mild resistance. The court therefore DENIES the Motion to Dismiss with respect to Count II of the Amended Complaint.

## III.    False Arrest

A § 1983 claim for false arrest "rest[s] on the Fourth Amendment right of an individual to be free from unreasonable seizures, including arrest without probable cause." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996). A claim for false arrest under § 1983 is substantially the same as a claim for false arrest under New York law. *Id.* To state a claim for false arrest under New York law, a plaintiff must plead "that (1) the defendant intended to confine him, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement and (4) the confinement was not otherwise privileged." *Jocks v. Tavernier*, 316 F.3d 128, 134–35 (2d Cir. 2003) (internal citation and quotation marks omitted).

"The existence of probable cause to arrest—even for a crime other than the one identified by the arresting officer—will defeat a claim of false arrest under the Fourth Amendment." *Figueroa v. Mazza*, 825 F.3d 89, 99 (2d Cir. 2016). "Generally speaking, officers have probable cause to arrest when they have reasonably trustworthy information as to facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *City of Yonkers*, 2025 WL 81386, at *5 (internal citation and quotation marks omitted). Qualified immunity adds a further level of protection to officers; in the context of false arrest, "an arresting officer is entitled to qualified immunity so long as 'arguable probable cause' was present when the arrest was made." *Figueroa*, 825 F.3d

at 100.  "A police officer has arguable probable cause if either (a) it was objectively reasonable

for the officer to believe that probable cause existed, or (b) officers of reasonable competence

could disagree on whether the probable cause test was met."  *Id.* (internal quotation marks and

citation omitted).

Defendants contend that Officers Andolina and Bebak had probable cause, or at least

arguable probable cause, to arrest Ms. Ghani for violation of N.Y. Penal Law § 195.05.  That law

provides, in relevant part:

> A person is guilty of obstructing governmental administration when he
> intentionally obstructs, impairs or perverts the administration of law or other
> governmental function or prevents or attempts to prevent a public servant from
> performing an official function, by means of intimidation, physical force or
> interference, or by means of any independently unlawful act . . . .

Defendants concede that Ms. Ghani did not engage in intimidation or physical force but contend

that she violated § 195.05 by intentionally "interfering" with the officers' attempt to remove

Ashton from her home.  (Doc. 10-1 at 19–20.)  According to Defendants, she interfered because

"she tried to explain her custody situation and did not comply with the Officers' directive to

leave the room."  (*Id.* at 19.)

Courts have read the term "physical" in § 195.05 as applying to both "force" and

"interference," so that a person is only guilty of obstructing governmental administration by way

of *physical* interference.  *See People v. Case*, 365 N.E.2d 872, 874 (N.Y. 1977).  "Thus, 'purely

verbal interference may not satisfy the "physical component under Penal Law § 195.05.""'

*Uzoukwu v. City of New York*, 805 F.3d 409, 414–15 (2d Cir. 2015) (quoting *In re Davan L.*,

689 N.E. 2d 909, 910 (N.Y. 1997)).  Thus, in *Uzoukwu*, the Second Circuit held that "refusal to

respond to an officer's questions cannot satisfy the 'interference' element of the charge for

obstruction of governmental administration, because silence does not entail a physical act."  *Id.*

at 415. Here, for the same reasons, Ms. Ghani's attempt to explain her custody situation cannot constitute "physical interference," nor could any officer reasonably believe that it constituted physical interference.

As for Ms. Ghani's refusal to leave her son's bedroom, "[g]eneral refusal to cooperate with the police does not violate [§ 195.05]." *In re Armell N.*, 905 N.Y.S.2d 471, 531 (N.Y. Fam. Ct. 2010); *Graham v. City of New York*, 128 F. Supp. 3d 681, 709 (E.D.N.Y. 2015) ("Failure to follow a police officer's instruction is not [obstruction of government administration] in every circumstance . . . ."). Furthermore, physical interference with the activities of law enforcement does not violate § 195.05 unless the officer's acts are "authorized by law." *Dancy v. McGinley*, 843 F.3d 93, 111 (2d Cir. 2016). That is, to support a conviction of obstructing governmental administration, the obstructed function must have been a lawful exercise of a public duty. *See In re Armell N.*, 905 N.Y.S.2d 471, 531 (N.Y. Fam. Ct. 2010); *see also, People v. Rodriguez*, 851 N.Y.S.2d 342, 305–06 (N.Y. Crim. Ct. 2008); *People v. Lupinacci*, 595 N.Y.S.2d 76 (2d Dept. 1993) (an arrest is only an "official function" under § 195.05 if the arrest is lawful). Thus, "[r]esisting an illegal search does not . . . constitute a violation of the statute." *Esmont v. City of New York*, 371 F. Supp. 2d 202, 210 (E.D.N.Y. 2005) (citing *People v. Vogel*, 457 N.Y.S.2d 666, 667 (1982)). Courts have therefore held that it is not a violation of § 195.05 to refuse to open one's door for law enforcement unless the officer has a warrant or an exception to the warrant requirement applies. *Dejesus*, 2025 WL 81386, at *6 (collecting cases).

In this case, the court has already determined that, on the facts alleged, the officers did not have a legal right to be in Ms. Ghani's home, nor could they have reasonably believed they had such a right. In turn, Ms. Ghani's refusal to comply with their order to leave Ashton's room did not violate § 195.05. *See Thompson v. Clark*, No. 14-cv-7349, 2018 WL 3128975, at *14

(E.D.N.Y. June 26, 2018) ("If [the officers] were not lawfully able to enter the home, then [Plaintiffs] committed no crime by obstructing their path." (citing *Lennon v. Miller*, 66 F.3d 416, 424 (2d Cir. 1995)).

Even assuming Officers Andolina and Bebak *were* lawfully in Ms. Ghani's home, they had no independent, lawful basis for attempting to remove Ashton from the home other than Ms. Ghani's consent.  The court has already established that, accepting the facts alleged in the Amended Complaint as true, no exigent circumstances justified the officers' actions. And, a month before the June 15 incident, the Supreme Court unequivocally held in *Caniglia v. Strom*, 593 U.S. 194 (2021) that the so-called "community caretaking" rule does not justify warrantless seizures in the home.  The community caretaking rule recognizes police officers' legitimate role in activities that promote public safety, even when those activities serve no law-enforcement function.  The rule arose in the context of disabled vehicles and car accidents.  *Cady v. Dombrowski*, 413 U.S. 433 (1973).  In *Caniglia*, the Supreme Court resoundingly rejected the First Circuit's extension of the rule to a case in which the police confiscated guns from the home of a man whom they believed was suicidal with the permission of his wife.  Discussing the community caretaking rule, the Court wrote, "this recognition that police officers perform many civic tasks in modern society was just that—a recognition that these tasks exist, and not an open-ended license to perform them anywhere." *Caniglia*, 593 U.S. at 199.  The Court then reaffirmed the narrow exceptions to the warrant requirement.

Here, Ms. Ghani's request that the police help her remove Ashton from her home was clearly in the scope of "community caretaking," not law enforcement.  There was no reason to believe that either Ashton or Ms. Ghani had committed a crime or that either was in immediate danger.  Thus, to the extent that Ms. Ghani was *intentionally* interfering with the officers'

attempts—as required by § 195.05—she was merely withdrawing the consent[6] that then served

as the sole basis for the officers' efforts to remove Ashton.

Under these circumstances, Officers Andolina and Bebak did not have arguable probable

cause to believe that Ms. Ghani violated New York Penal Law § 195.05 because there was no

legally authorized act for her to obstruct, nor was it reasonable for them to believe that she was

obstructing a legally authorized act.  The Motion to Dismiss is DENIED as to Count III of the

Amended Complaint.

## IV.    Malicious Prosecution

"Claims for malicious prosecution brought under Section 1983 are substantially the same

as claims for malicious prosecution brought under state law." *Ortiz v. Stambach*, 137 F.4th 48,

61 (2d Cir. 2025).

> New York law "places a heavy burden on malicious prosecution plaintiffs,
> requiring that they establish four elements: (1) the commencement or continuation
> of a criminal proceeding by the defendant against the plaintiff, (2) the termination
> of the proceeding in favor of the accused, (3) the absence of probable cause for the
> criminal proceeding and (4) actual malice."

*Calicchio v. Sachem Cent. Sch. Dist.*, 185 F. Supp. 3d 303, 313 (E.D.N.Y. 2016) (quoting *Smith-*

*Hunter v. Harvey*, 734 N.E.2d 750, 753 (N.Y. 2000)).  "Additionally, there must be a post-

arraignment seizure for a § 1983 malicious prosecution claim," although "the requirements of

attending criminal proceedings and obeying the conditions of bail suffice on that score." *Jocks*,

316 F.3d at 136.  As with false arrest, "the existence of probable cause is a complete defense to a

claim of malicious prosecution in New York." *Manganiello v. City of New York*, 612 F.3d 149,

161–62 (2d Cir. 2010) (quoting *Savino v. City of New York*, 331 F.3d 63, 72 (2d Cir. 2003))

(alteration omitted).

---

[6] The court is assuming, for simplicity, that she had given such consent.

Ms. Ghani alleges malicious prosecution for four separate charges: (1) Obstructing

Government Administration in the Second Degree, N.Y. Penal Law § 195.95; (2) two counts of

Harassment in the Second Degree, N.Y. Penal Law § 240.26; and (3) Endangering the Welfare

of a Child, N.Y. Penal Law § 260.10.  Ms. Ghani has clearly pled, and Defendants do not dispute

that she has pled, the first two elements of a claim for malicious prosecution.  Defendants argue,

however, that probable cause existed for each of the charges and that Ms. Ghani has failed to

adequately allege malicious intent.[7]  (Doc. 10-1 at 20–26.)

### A.    Probable Cause

Unlike a plaintiff bringing a claim for false imprisonment, "[w]here the plaintiff institutes

a malicious prosecution action he must plead the lack of probable cause." *Broughton v. State*,

335 N.E.2d 310, 314 (N.Y. 1975).  "Probable cause, in the context of malicious prosecution, has

been described as such facts and circumstances as would lead a reasonably prudent person to

believe the plaintiff guilty." *Ortiz*, 137 F.4th at 61.  In other words, the plaintiff must prove that

"the defendant lacked probable cause to believe that the plaintiff could be successfully

prosecuted," *Angevin v. City of New York*, 204 F. Supp. 3d 469, 481 (E.D.N.Y. 2016) (citing

*Posr v. Court Officer Shield No. 207*, 180 F.3d 409, 417 (2d Cir. 1999)), "a more exacting

standard than the standard required to support an arrest." *Emanuel v. Griffin*, No. 13-cv-1806,

2015 WL 1379007, at *8 (S.D.N.Y. Mar. 25, 2015).  However, "a malicious prosecution claim

will be defeated by a finding of probable cause to arrest, unless the plaintiff can demonstrate

---

[7] The parties have not addressed whether Ms. Ghani sufficiently pled a deprivation of
liberty amounting to a "seizure" as required to state a claim for malicious prosecution under
§ 1983.  The court therefore assumes for the purposes of the Motion to Dismiss that Ms. Ghani
has met that pleading requirement.

mitigating facts to vitiate probable cause which were first uncovered after the arrest." *Drummond v. Castro*, 522 F. Supp. 2d 667, 678 (S.D.N.Y. 2007).

"Normally, an arrest warrant issued from a neutral magistrate creates the presumption of probable cause." *Phillips v. DeAngelis*, 571 F. Supp. 2d 347, 354 (N.D.N.Y. 2008) (citing *United States v. Ventresca*, 380 U.S. 102, 109 (1965) and *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991)).  To overcome the presumption of probable cause created by a warrant to arrest, the plaintiff must "make 'a substantial preliminary showing' that the affiant knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit and that the allegedly false statement was 'necessary to the finding of probable cause.'" *Golino v. City of New Haven*, 950 F.2d 864, 870 (2d Cir. 1991) (quoting *Franks v. Delaware*, 438 U.S. 154, 155–56 (1978)).  No presumption of probable cause is created, however, when "the warrant is issued by a judge on the basis of the sworn accusations of the defendant in the malicious prosecution action." *Russo v. State of New York*, 672 F.2d 1014, 1018 (2d Cir. 1982); *see also Winn v. McQuillan*, 390 F. Supp. 2d 385, 390 (S.D.N.Y. 2005); *Lenhard v. Dinallo*, No. 08-cv-165, 2011 WL 4592804, at *7 (N.D.N.Y. Sept. 30, 2011).

"Although probable cause is a complete defense to both false arrest and malicious prosecution claims, the existence of probable cause in each claim must be evaluated separately" because the question in a false arrest claim "is whether there was probable cause for the arrest," whereas the question in a malicious prosecution claim is "whether there was probable cause to believe the criminal proceeding could succeed and hence, should be commenced." *Lenhard*, 2011 WL 4592804, at *6 n.6.  The court therefore briefly revisits the issue of probable cause for the charges under Penal Law § 195.05.  Here, Ms. Ghani has pled that Officers Andolina and Bebak wrote the affidavit supporting the charge, so no presumption of probable cause arises in

their favor. And, because all of the acts that would support a conviction occurred within the presence of the officers, the fact that they lacked probable cause to arrest Ms. Ghani necessarily means that there was no probable cause to commence a criminal proceeding against her.

Ms. Ghani was also charged under N.Y. Penal Law § 240.26 in connection with the June 15 incident, which provides in relevant part:

> A person is guilty of harassment in the second degree when, with intent to harass, annoy or alarm another person:
>
> 1. He or she strikes, shoves, kicks or otherwise subjects such other person to physical contact, or attempts or threatens to do the same; or
>
> 2. He or she follows a person in or about a public place or places; or
>
> 3. He or she engages in a course of conduct or repeatedly commits acts which alarm or seriously annoy such other person and which serve no legitimate purpose.

As with the charge under § 195.05, Ms. Ghani has pled that Officers Andolina and Bebak wrote the affidavit supporting the warrant for her arrest, so there is no presumption of probable cause. Defendants assert, however, that there was probable cause to arrest Ms. Ghani under Penal Law § 240.26 because she pulled her arm away when Officer Bebak grabbed it and because she refused to leave her son's room after Officer Andolina directed her to do so. The court disagrees. First, the court rejects the notion that Ms. Ghani engaged in "physical contact" within the meaning of § 240.26 when she withdrew her arm. She did not initiate the contact and, in fact, sought to *end* the contact. She cannot be said to have "subjected" Officer Andolina to physical contact. Nor can Ms. Ghani's conduct constitute a "course of conduct" within the meaning of the statute because "one 'isolated incident' is insufficient to establish such a course of conduct." *Carney v. Carney*, 220 N.Y.S. 3d 534, 535 (N.Y. Sup. Ct., 4th Dept. 2024). The officers therefore lacked probable cause to arrest Ms. Ghani under § 240.26 for the events on June 15, 2021. As with the charge under § 195.05, because all of the actions that allegedly

constituted the offense occurred in the presence of the officers, the lack of probable cause to arrest also necessarily means that they lacked probable cause to commence proceedings against her.

Conversely, the Amended Complaint fails to plead sufficient facts to plausibly allege that Defendants lacked probable cause for the harassment charges brought on or about October 13, 2021. Ms. Ghani has pled that the West Seneca Police Department initiated this "false" criminal charge against her, "allegedly for harassing calls she made to a mother of her son's friends who was hosting her sons." (Doc. 8 ¶ 45.) According to the Amended Complaint, "[t]he assistant WSPD chief had previously called the mother on or around October 11, 2021 threatening to arrest her if she did not send Ms. Ghani's sons home." (*Id*.) The Amended Complaint provides no further details about what occurred on October 13, 2021, whether Ms. Ghani was arrested pursuant to a warrant, or who—if anyone—drafted the affidavit supporting the warrant.

Even assuming that there is no presumption of probable cause in Defendants' favor, these pleadings do not provide enough detail to make it plausible that Ms. Ghani was prosecuted in the absence of probable cause. Certainly, her allegations leave open the possibility that Defendants' lacked probable cause, but that alone does not make Ms. Ghani's claims plausible.

Ms. Ghani has similarly provided very little detail about the child endangerment charges brought against her after an incident on September 7, 2021. Under N.Y. Penal Law § 260.10, a person is guilty of endangering the welfare of a child when:

> 1. He or she knowingly acts in a manner likely to be injurious to the physical, mental or moral welfare of a child less than seventeen years old or directs or authorizes such child to engage in an occupation involving a substantial risk of danger to his or her life or health; or
>
> 2. Being a parent, guardian or other person legally charged with the care or custody of a child less than eighteen years old, he or she fails or refuses to exercise reasonable diligence in the control of such child to prevent him or her from

becoming an "abused child," a "neglected child," a "juvenile delinquent" or a "person in need of supervision," as those terms are defined in articles ten, three and seven of the family court act.

The Amended Complaint states that the West Seneca Police Department "initiated false criminal charges against Ms. Ghani for child endangerment, upon information and belief in retaliation and to further punish her for the [June 15] incident." (Doc. 8 ¶ 43.) Ms. Ghani then alleges that these charges "were dismissed by the West Seneca Town Court in October 2021 after Ms. Ghani's daughter appeared and told the District Attorney that Ms. Ghani had done nothing wrong." (*Id.* ¶ 44.) The Amended Complaint contains no further information about the underlying incident, charges, or judicial process.[8] These pleadings are simply too threadbare to demonstrate that the West Seneca Police Department lacked probable cause for the charges and the ensuing prosecution. And Ms. Ghani's allegations that the WSPD harbored animus toward her is not enough on its own to overcome that deficiency.

### B.    Malicious Intent

"A lack of probable cause generally creates an inference of malice." *Manganiello*, 612 F.3d at 163 (quoting *Boyd v. City of New York*, 336 F.3d 72, 78 (2d Cir. 2003) (alteration omitted). Thus, for the charges arising from the June 15 incident, Ms. Ghani has met her burden on the issue of malicious intent. *See Kurtz v. Hansell*, 2021 WL 1143619, at *16 (S.D.N.Y.

---

[8] In her response to Defendants' Motion to Dismiss, Ms. Ghani provides these additional details:

> The Amended Complaint alleges that on September 7, 2021, Ms. Ghani refused to allow her daughter Alana to enter her home late at night to retrieve clothes (at a time when she did not reside with Ms. Ghani), as Alana had had ample opportunity to do so earlier in the day. (Am. Compl. ¶ 44). Ms. Ghani contends that this decision was a matter of enforcing household rules and maintaining structure, not endangering her child's welfare.

(Doc. 11 at 14.)

Mar. 24, 2021) ("Last, plaintiffs must allege that defendants acted with 'actual malice.' That burden is easily satisfied because, at the pleading stage, lack of probable cause generally raises an inference of malice. Accordingly, plaintiffs have plead each element of their claim for malicious prosecution." (internal quotation marks and citations omitted)). The court need not analyze Ms. Ghani's pleadings of malicious intent regarding the prosecutions connected to the September 7 and October 13 incidents because Ms. Ghani failed to plead lack of probable case.

The Motion to Dismiss is GRANTED with respect to Ms. Ghani's claims for malicious prosecution connected to the September 7 and October 13 incidents and DENIED with respect to the claims arising from the June 15 incident.

## V.    Destruction of Evidence

Ms. Ghani alleges that Defendants destroyed evidence by deleting videos that she took of the incident on June 15, 2021, and of the events on June 12, 2021, when Officer Andolina responded to a call at Ms. Ghani's home. (Doc. 8 ¶ 36.) Specifically, she alleges that she recorded the incidents and that, after she was handcuffed and brought to the kitchen on June 15, she told the additional officers who had arrived on scene that she had been recording the entire incident. (*Id.*) When she later retrieved her phones, however, the recordings had been deleted. (*Id.*) Her son Ashton reported that he had seen police officers "handling Ms. Ghani's phones in his room after she had been taken to the police station." (*Id.*)

"A criminal defendant is entitled to relief based on the government's pre-trial destruction of (or failure to preserve) potentially exculpatory evidence where: (1) the government . . . acted in bad faith in destroying the evidence; (2) the evidence . . . possess[ed] an exculpatory value that was apparent before it was destroyed; and (3) the defendant [was] unable to obtain comparable

evidence by other reasonably available means."[9]  *United States v. Hunley*, 476 F. App'x 897,

898–99 (2d Cir. 2012) (quoting *United States v. Tyree*, 279 F. App'x 31, 33 (2d Cir. 2008))

(alterations in original); *see also Arizona v. Youngblood*, 488 U.S. 51, 58 (1988) ("[U]nless a

criminal defendant can show bad faith on the part of the police, failure to preserve potentially

useful evidence does not constitute a denial of due process of law.").

   Defendants argue that the Amended Complaint fails to establish that the exculpatory

value of the videos was known to the officers at the time of their destruction and that it provides

no factual allegations to support a finding of bad faith.  (Doc. 10-1 at 29.)  Defendants further

contend that Ms. Ghani failed to allege that comparable evidence was unavailable by other

reasonably available means.

   "[T]he government acts in bad faith when the record shows that evidence was

'intentionally destroyed.'"  *United States v. Soriano*, 401 F. Supp. 3d 396, 401 (E.D.N.Y. 2019)

(quoting *United States v. Steele*, 390 F. App'x 6, 9 (2d Cir. 2010)).  Ms. Ghani has alleged

precisely that: that the officers intentionally deleted videos that captured much of the alleged

wrongful activity.  And the pleadings support the inference that the officers knew the

exculpatory value of the videos.  Officer Andolina, in particular, knew what had occurred on

both June 12 and June 15 and, therefore, what the videos would show.  In this case, the value of

the videos as evidence is also seemingly self-evident.  For the same reason, Defendants'

contention that witness testimony would be comparable evidence is unavailing.  Video evidence

simply convinces people in a way that witness testimony does not, especially when it is the word

---

[9] Although Ms. Ghani is not a criminal defendant in this case, she challenges the
destruction of the videos insofar as those videos constituted exculpatory evidence in her criminal
proceedings.  Thus, the appropriate standard for determining whether Ms. Ghani is entitled to
relief is the standard for criminal defendants.

of a defendant (and potentially her son) against the word of two police officers. Ms. Ghani has successfully pled the elements of her claim for destruction of evidence. The Motion to Dismiss is therefore DENIED on this claim.

## VI.    Fabrication of Evidence

"When a police officer creates false information likely to influence a jury's decision and forwards that information to prosecutors, he violates the accused's constitutional right to a fair trial, and the harm occasioned by such an unconscionable action is redressable in an action for damages under 42 U.S.C. § 1983." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 130 (2d Cir. 1997). Here, Ms. Ghani alleges that Defendants Andolina and Bebak included false claims in the affidavit supporting the warrant for her arrest, specifically that she entered her son's room "yelling profanities at Officer Andolina and that he had repeatedly told her to step back" and that "Ms. Ghani was clenching her fists, leading them to fear she might strike them." (Doc. 8 ¶ 38.)

Ms. Ghani has plausibly pled that Defendants lied in their affidavit. The facts allegedly included in the affidavit do not match Ms. Ghani's account of the events on June 15, an account which the court must accept as true at this stage in the proceedings. And a jury considering Ms. Ghani's charges for obstruction of government administration, harassment, and resisting arrest would likely be influenced by statements from the police that Ms. Ghani entered the room screaming profanities and clenching her fists, given that a key factor in those charges is Ms. Ghani's intent and state of mind. The Amended Complaint therefore states a plausible claim for fabrication of evidence. The court DENIES the Motion to Dismiss on this count of the Amended Complaint.

## VII.    Municipal Liability

In addition to the claims against Officer Andolina, Officer Bebak, and John Doe Officers, Ms. Ghani seeks to hold the Town of West Seneca liable for the alleged constitutional injuries she suffered.  As the Supreme Court explained in *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978), a local government is only liable under § 1983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury."  "[W]hen a subordinate municipal official is alleged to have committed the constitutional violation, municipal liability turns on the plaintiffs' ability to attribute the subordinates' conduct to the actions or omissions of higher ranking officials with policymaking authority."  *Amnesty Am. v. Town of West Hartford*, 361 F.3d 113, 126 (2d Cir. 2004).  One "method of implicating a policymaking official through subordinates' conduct is to show that the policymaker was aware of a subordinate's unconstitutional actions, and consciously chose to ignore them, effectively ratifying the actions."  *Id.*  "[B]ecause a single action on a policymaker's part is sufficient to create a municipal policy, a single instance of deliberate indifference to subordinates' actions can provide a basis for municipal liability."  *Id.* at 127.

In the Amended Complaint, Ms. Ghani alleges that the Town of West Seneca and the West Seneca Police Department "have a custom, policy, or practice of failing to properly screen, hire, train, supervise, and discipline their officers regarding the use of force, entry into residences, interactions with citizens invoking their parental rights, and probable cause for arrests and prosecutions."  (Doc. 8 ¶ 82.)  She further alleges that West Seneca and the WSPD have a "custom, policy or practice of retaliating against citizens through false arrests and malicious prosecutions when citizens attempt to lawfully assert their rights as parents or complain about

35

police misconduct." (*Id.* ¶ 83.) According to the Amended Complaint, "[t]he continued

initiation of false charges against Ms. Ghani, even for incidents where police were not present

and Ms. Ghani was acting lawfully as a parent, demonstrates this unconstitutional custom,

policy, or practice." (*Id.*)

"[M]ere allegations of a municipal custom or practice of tolerating official misconduct

are insufficient to demonstrate the existence of such a custom unless supported by factual

details." *D'Angelo v. City of Lockport*, No. 19-cv-221, 2023 WL 6812135, at *4 (W.D.N.Y.

July 14, 2023) (quoting *Lilly v. Hall*, No. 16-cv-242, 2019 U.S. Dist. LEXIS 10152, *12–13

(W.D.N.Y. Jan. 22, 2019) (alteration in original); *see also Green v. Dep't of Educ. of N.Y.*,

16 F.4th 1070, 1077 (2d Cir. 2021) ("[A] general and conclusory allegation of a municipal policy

or custom fails to state a plausible claim"). Here, Ms. Ghani supports her claims with just two

factual allegations: First, she alleges that West Seneca and the WSPD "failed to properly train

and supervise Defendants Andolina, Bebak, and John Doe Officers regarding constitutional

limits on use of force, entries into homes, probable cause for arrest, lawful assertions of parental

rights, preservation of evidence, and the requirement to provide truthful information in police

reports and affidavits, despite knowing that such encounters are common for WSPD officers."

(Doc. 8 ¶ 84.) Second, she alleges that West Seneca ratified the officers' unconstitutional acts

"by failing to adequately investigate complaints against them or discipline them for their actions

against Ms. Ghani and others." (*Id.* ¶ 85.) The Amended Complaint includes no allegations that

Ms. Ghani submitted complaints against the defendant officers.

These general allegations are insufficient to plausibly plead an official policy or custom.

*See Green*, 16 F.4th at 1077 ("Here, Green alleged generally that the DOE 'target[s]' African-

American male teachers 'who speak out' and that these teachers are 'almost always terminated'

36

at disciplinary hearings whereas two non-African-American teachers received lesser sanctions for similar conduct. We agree with the district court that these allegations are insufficient to plausibly plead an official policy or custom." (alteration in original) (internal citation omitted)). The first of her factual allegations is entirely conclusory. And she does not support the second with an allegation that she or anyone else has submitted a complaint against WSPD officers that was subsequently ignored. Without more, the claim cannot proceed. The Motion to Dismiss is GRANTED on this claim.

**Conclusion**

Defendants' Motion to Dismiss (Doc. 10) is GRANTED IN PART and DENIED IN PART as set forth herein.

Dated this 12 day of August, 2025.

Geoffrey W. Crawford, Judge
United States District Court